# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| CLINTON DICKINSON, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 6:16-cv-03008-NKL ) |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) ) ) |
| Defendant. | ) ) |

## ORDER

Clinton Dickinson appeals the Commissioner of Social Security's final decision denying his application for disability insurance benefits. The Commissioner's decision is affirmed.

## I. Background

Dickinson was born in 1974 and left high school after completing the eighth grade. He has worked as a furniture mover, lumber handler, delivery driver, and warehouse worker, but has not worked since August 1, 2011. He claims disability based on back problems, among other conditions.

### A. Medical history

Dickinson went to the emergency room in September 2011 complaining of back pain after moving a heavy recliner chair. He reported moderate pain and stated he had never experienced similar symptoms before. On examination, he did not appear to be in any distress, and displayed normal motor strength in the arms and legs, normal gait, normal straight leg raise bilaterally, and intact cranial nerves and sensory abilities. He was diagnosed with lumbar strain, prescribed pain medicine, an anti-inflammatory and muscle relaxer.

He saw Richard Griffith, M.D. at Jordan Valley Community Health Center in November

2011, complaining of back and knee pain after "overexert[ing] himself while deer hunting[.]" Tr. 500. Dr. Griffith noted Dickinson's general medical exam was normal and that Dickinson "OK" to search for work despite his lower back pain. Tr. 501.

Dickinson complained to his doctor of low back pain after changing a tire in January 2012 and after washing the car in February 2012. In May 2012, a CT scan of Dickinson's spine was unremarkable, but minimal spurring suggested posterior disk bulge at L4-L5, and an MRI was recommended. He saw Dr. Griffith in June, July, September, October, and November 2012. His medications for back pain were refilled and the doctor referred him for a neurological consultation. He saw Dr. Griffith in January 2013 for follow up of pain management, reporting that the pain medication was working well.

In July 2013, Chad Morgan, M.D., a neurologist at Springfield Neurological & Spine Institute, reviewed Dickinson's films. The doctor concluded Dickinson did "not have any surgical issues from the imaging provided [and] would likely benefit from conservative therapy." Tr. 443.

Later the same month, Dickinson saw Randal Hamric, M.D. at Jordan Valley for medication refills and said he had had "right leg pain since 2010." Tr. 464. Dr. Hamric noted he had not yet heard from Dr. Morgan, but that the prior CT showing minimal disk bulge. Under Assessment and Plan, the doctor wrote that he would "continue [pain medications] for a few more months but did discuss weaning if no or normal MRI[.]" Tr. 466.

Dickinson next saw Dr. Hamric on August 6, 2013, complaining of right-sided pain from shoulder to leg and that extended walking caused leg numbness. Dr. Hamric noted Dickinson's CT and x-rays had shown "essentially normal" results, and had been reviewed by a doctor at the spine clinic who concluded there were no treatable lesions. Tr. 461. Dr. Hamric noted Dickinson "kept trying to describe why he still needed pain medications." *Id.* The doctor further wrote that

2

Dickinson "became agitated when it was clear I was not going to fill more narcotics. I offered to try Neurontin for his lumbar radicular pain but he declined. I ended [the] visit as I had nothing more to offer him as he refused to do exercises and did not want Neurontin." Tr. 462.

On August 28, 2013, Dickinson saw Dr. Langguth, M.D. for medication refills. He reported his back pain as "moderate" and said Dr. Hamric had not refilled a narcotic prescription. Tr. 458. Dr. Langguth noted tenderness on palpation of the spine and lumbar region. He noted he would allow Dickinson to continue on hydrocodone and Neurontin for pain as he attempted to get insurance coverage for an MRI, but Dickinson would have to continue showing progress on that front. Tr. 459.

At a visit with Dr. Langguth in November 2013, Dickinson reported his back pain was moderate. Dr. Langguth noted tenderness along the spine and in the lumbosacral region, with no spasm, and the Assessment was backache. Under Plan, the doctor noted he would await an x-ray report and then probably schedule an MRI. He continued Dickinson's medications.

A November 15, 2013 x-ray of Dickinson's lumbar spine showed normal alignment and contour, "relatively mild multilevel degenerative joint and disk disease" and no loss of joint height or fracture. Tr. 511. A December 2013 MRI of Dickinson's lumbosacral spine showed focal disk protrusion at L4-5 in the central right paracentral region with mild to moderate narrowing upon the thecal sac, and a congenitally small central spinal canal.

Dickinson followed up with Dr. Langguth in February 2014. The doctor reviewed the MRI results and noted there was also bilateral nerve impingement. Dickinson complained that his back pain had begun six years earlier and was worsening. He also said that a recent car accident had shaken him up, but had not worsened his chronic pain. On exam, Dr. Langguth found tenderness and muscle spasm in Dickinson's back. The doctor continued Dickinson on his pain medications and added a muscle relaxer. The doctor also noted he would get a

3

neurosurgical referral to see if there was anything that could be done for the bilateral nerve impingement.

In April 2014, Dickinson complained to Dr. Langguth that his back pain was changing in character: the pain occurred persistently, was aggravated by sitting, and caused him trouble sleeping, and the muscle relaxer was not as effective as when he first started taking it. Dr. Langguth found tenderness and muscle spasm in Dickinson's back on exam. The doctor continued Dickinson's medications, added a prescription for insomnia, and directed Dickinson to return in four months or as needed. A neurological consult was scheduled for September 2014.

In May 2014, Dickinson went to the hospital with complaints of pain in his abdomen, back, and chest. No tests were performed. He was given an injection for pain and was prescribed a steroid and muscle relaxer. He followed up with Chan Reyes, M.D. at Jordan Valley. On physical exam, the doctor noted no abdominal tenderness; normal cervical and thoracic spine; tenderness of the lumbar spine; and negative straight leg raise. The doctor continued Dickinson's medications, added Neurontin, and told him to return in four weeks for a recheck or sooner if needed.

Dickinson saw Dr. Morgan, his neurologist, in September 2014. On physical exam, the doctor noted Dickinson's paraspinous muscles were symmetric and normal in tone without spasm; range of motion of the cervical and lumbar spine was normal; Spurling's maneuver was negative; the straight leg raise was tolerated to 80 degrees; femoral stretch was negative; gait and station were normal; bilateral upper and lower extremities on inspection were symmetric without tenderness and there was normal range of motion; no joint instability or laxity; and the upper and lower extremity strength was normal in tone. Dickinson's deep tendon reflexes in the upper and lower extremities were normal, and there was no clonus, and no Babinski or Hoffmann sign. Under Impression, the doctor noted "back pain, lumbar, with radiculopathy," and:

4

> 1. Low back pain with associated RLE [right lower extremity] pain consistent with L5 pattern.
> 2. RLE weakness: EHL [extensor hallucis longus] mild
> 3. Conservative management: pain meds.
> 4. HTN [hypertension]: controlled with meds.
> 5. MR as detailed above: L4/6 Right paracentral disc.

Tr. 589. Under Plan, the doctor noted he would refer Dickinson to be seen by a physiatrist, with follow up in four to six months if Dickinson was not better. Dr. Morgan talked to Dickinson about surgical and non-surgical treatment options, and the importance of weight management, exercise, core body strengthening, flexibility, and proper lifting techniques with respect to success of the treatment options. *Id.*

In June 2014, Dickinson saw Dr. Langguth with complaints that his back pain was severe, worsening, and occurring daily, and that he had trouble sleeping. The doctor noted Dickinson had a "history of drug seeking per alert." Tr. 526. On physical exam, the doctor noted back tenderness and muscle spasm. Under Assessment and Plan, the doctor wrote that he would try increasing the muscle relaxer and adding Lidoderm patches; that Dickinson was eligible for referral to a pain management clinic; and that Dickinson was scheduled to see the neurologist in a few months.

In July 2014, Dickinson saw Dr. Langguth for "recheck on back pain." Tr. 530. He reported that his symptoms were severe and occurred constantly, the pain patches were not helping, and he was not sleeping well because of pain. On physical exam of Dickinson's spine and back, the doctor noted tenderness and muscle spasm. Under Assessment and Plan, the doctor wrote that he would increase Dickinson's hydrocodone and start a muscle relaxer. The doctor also noted Dickinson had a neurosurgical consult in September, so he would "not worry about getting [Dickinson] in to pain management until after he has gotten his [evaluation] by [a neurosurgeon.]" Tr. 532. Dickinson was to return as needed.

5

In November 2014, Dr. Langguth approved Dickinson for a disabled license placard. On the form, the doctor checked the box indicating the applicant "cannot ambulate or walk 50 feet without stopping to rest due to a severe, disabling arthritic, neurological, orthopedic condition, or other severe and disabling condition." Tr. 547. The doctor also checked the box for temporary, rather than permanent, disability. The form provides that a temporary placard is valid up to 180 days from the date of the application, and where the form requests that an end date be provided, the doctor wrote "5/1/2015." *Id.*

### B. Consultants' opinions

Dickinson saw Charles Ash, M.D. for a consultative exam in September 2013 in connection with his application for Medicaid. Dr. Ash noted Dickinson was able to walk heel to toe; stood erect; moved without limp; had moderate difficulty getting up from the exam table; had no difficulty arising from a chair or dressing and undressing; could squat only 25% of normal; had tenderness in the thoracic and lumbar spine; had limited forward flexion and slightly limitation in lateral bending to the left but was otherwise normal; had normal range of motion in the extremities; had normal reflexes and strong grip and pinch strength; had straight leg raise to 45 degrees but normal pulses and reflex, and no muscle weakness, atrophy, or sensory deficit. Dr. Ash's Impression was "possible degenerative disease of the lumbar spine." Tr. 603. Dr. Ash concluded:

> [Dickinson] should be considered permanently and totally disabled for ordinary work for which he is fitted for one year. He is illiterate and must do manual work. This would enable him to receive a Medicaid card and an MRI of the lumbar spine to determine more adequately (the) present diagnosis.

Tr. 603. Dickinson was subsequently approved for Medicaid.

At the request of the SSA, Dickinson saw Thomas Corsolini, M.D., a physical medicine and rehabilitation specialist, in August 2014. Dr. Corsolini reviewed the December 2013 MRI

6

and the Jordan Valley records. On physical exam, Dr. Corsolini noted positive straight-leg raise on the right and negative on the left; that Dickinson was able to squat with handhold assistance, able to walk without assistive device and without a limp, and had normal heel and toe walk, and smooth overall gait pattern with good balance; some limit in lumbar flexion and extension; symmetrical reflexes; and normal range of hip motion, bilaterally. Under Discussion, Dr. Corsolini wrote:

> Impression is probable right-sided lumbar pain with radicular radiation to the right leg. His diagnostic testing supports this impression and his complaints are consistent with that. I am recommending limitations in the functional capacities chart attached with this report.

Tr. 536. In the functional capacities chart, the doctor included limitations of occasional lifting and carrying of up to ten pounds; 30 minutes of continuous sitting, standing or walking; and a total of four hours sitting, two hours standing, and two hours walking in an eight-hour work day. Tr. 537-38. The final page of the functional capacities chart form asks, "Have the limitations you found above lasted or will they last for 12 consecutive months?" Tr. 452. Dr. Corsolini checked, "No," and wrote, "Could improve [with] treatment[.]" *Id.*

### C. The hearing before the ALJ

Dickinson testified that he has worked as a furniture mover, lumber handler, delivery driver, and warehouse worker, all jobs that involve heavy lifting. He testified he cannot do those jobs any longer because of back pain he has had every day and numbness in the right leg since 2011. He testified that he can stand or sit up to 20 minutes at a time before needing to change position; walk up to 15 minutes at a time; and lift or carry up to five or ten pounds, but not for eight hours a day.

Dickinson drives his son to school once or twice a week. He watches television during the day and can prepare simple meals. He occasionally goes grocery shopping and uses an

7

electric cart at the store.

### D. The decision

The ALJ determined Dickinson suffered from severe impairments of degenerative disc disease of the lumbar spine with protrusion, a congenitally small spinal canal, degenerative disc disease of the cervical spine, and obesity, and concluded Dickinson retained the RFC:

> [T]o perform a range of sedentary work as defined in 20 CFR 404.1567(a); that is, lift and carry up to 10 pounds occasionally and less than 10 pounds frequently; stand and/or walk 2 hours in an 8 hour workday; sit 6 hours in an 8 hour workday; push/pull the same weights; no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs; occasional balancing, stooping, kneeling, crouching, and crawling; frequent reaching in all directions and frequent handling, fingering and feeling bilaterally. The claimant must avoid concentrated exposure to vibration and even moderate exposure to hazards such as unprotected heights and dangerous moving machinery.

Tr. 38. Relying on vocational expert testimony, the ALJ concluded Dickinson could not perform his past relevant work, but could perform work as a food and beverage order clerk, a telephone quotation clerk, and document preparer, jobs that existed in significant numbers in the national economy.

## II. Discussion

Focusing on his back, Dickinson argues the decision must be reversed because the RFC is "against the weight of evidence as a whole," including "restrictions confirmed or authored by any physician," and there was not "any medical evidentiary basis" for finding Dickinson could perform sedentary work without additional limitations. Doc. 10, p. 9, and Doc. 14, p. 1.

Dickinson's arguments are unpersuasive. First, review of the Commissioner's RFC determination does not involve "weigh[ing]" all the evidence and deciding whether the evidence supporting the RFC tips the scales. The question is whether the findings are supported by substantial evidence on the whole record. *Byers v. Astrue*, 687 F.3d 913, 915 (8th Cir. 2012).

8

Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support a decision. *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015). If there is substantial evidence in support, then a reviewing court "does not reverse[,] even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Byers*, 687 at 915. *See also Chaney v. Colvin,* 812 F.3d 672, 676 (8th Cir. 2016) (if, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, then the court must affirm the ALJ's decision).

Next, a claimant's RFC is not a medical determination that must be made by a doctor. It is ultimately an administrative determination by the Commissioner. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012); 20 C.F.R. §§ 404.1545-.1546 and 416.945-.946. More specifically, the RFC is what a claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a). It is an assessment based upon all of the relevant evidence including a claimant's description of his limitations, observations by treating and examining physicians or other persons, and medical records. 20 C.F.R. § 404.1545(a). *See also* SSR 96-8P, 1996 WL 37418, at *7, "Policy Interpretation Ruling, Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims" (June 6, 1996) (RFC analysis should consider medical and non-medical evidence). Put another way, the RFC must be based upon all of the substantial evidence, and must be supported by at least some medical evidence. *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000).

Dickinson specifically argues that a medical opinion must support each limitation incorporated in the RFC. The ALJ is not required to provide each limitation in the RFC assessment immediately followed by a list of specific evidence supporting the limitation. *See* SSR 96-8p. Moreover, the components of the RFC are not required to be linked to a specific medical opinion. *Martise v. Astrue,* 641 F.3d 909, 927 (8th Cir. 2011) (citing *Schmidt v. Astrue,* 496 F.3d 833, 845 (7th Cir. 2007)). In *Schmidt,* for example, the claimant argued that the ALJ

9

should have adopted her residual functional capacity as determined by one of her physicians. But the court held that the ALJ is required to consider the entire record and is not required to rely entirely on a particular physician's opinion or choose between the opinions any of the claimant's physicians, in considering all of the claimant's physicians' opinions, along with her testimony and the other record evidence. 496 F.3d at 845.

Here, the ALJ's formulation of the RFC at step four, for sedentary work as defined in 20 CFR § 404.1567(a)[1], was based on substantial evidence on the whole record, including medical evidence. Dickinson's medical records show he has had CTs, MRIs, and x-rays over the course of about three years, beginning in 2012, which revealed "unremarkable," "normal," "mild," "relatively mild," or "mild or moderate" results. Several physical examinations by different physicians during the relevant time period revealed normal or negative findings, including normal muscle tone; normal reflexes; and ability to walk with a normal gait, without a limp, and

---

[1] The regulation describes sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a). For purposes of the regulation, "occasionally" means:

> [O]ccurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles."

SSR 83-10, 1983 WL 31251, *5.

without the use of an assistive device.

No physician ordered Dickinson to refrain from physical activity during the relevant time period. To the contrary, in late 2011, Dr. Griffith noted Dickinson was "OK" to search for work despite lower back pain after the deer hunting incident. Dr. Hamric noted in 2013 that Dickinson "refused" to do exercises for his back. Dickinson's neurologist, Dr. Morgan concluded in July 2013 that Dickinson "would likely benefit from conservative therapy" and at a follow up visit in September 2014, Dr. Morgan noted he would refer Dickinson to a physiatrist. In late 2014, Dr. Langguth did authorize a disabled parking placard, but it was a temporary rather than permanent one, good for six months, and expired in May 2015. The doctor checked the box on the form relating to inability to ambulate or walk 50 feet without stopping. But nothing in the treatment records indicates Dr. Langguth ordered Dickinson not to walk at all, or to otherwise refrain from all physical activity. A lack of significant functional restrictions imposed by treatment providers is inconsistent with allegations of disabling limitations. *Hensley v. Barnhart,* 352 F.3d 353, 357 (8th Cir. 2003).

Furthermore, the ALJ accounted in the RFC for Dickinson's testimony that he could lift or carry up to ten pounds, and that his ability to walk was limited. The RFC is for sedentary work, which is work performed primarily while sitting, and requires lifting up to ten pounds occasionally, and standing and walking for only two hours in an eight-hour work day. 20 C.F.R. §§ 404.1567(a) and 416.967(a); SSR 83-10, 1983 WL 31251, *5.[2] The ALJ included additional limitations of no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps or stairs;

---

[2] "'Occasionally'" means occurring from very little up to one-third of the time. Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles." SSR 83-10, 1983 WL 31251, *5.

11

occasional balancing, stooping, kneeling, crouching, and crawling; and avoiding concentrated exposure to vibration and even moderate exposure to hazards such as unprotected heights and dangerous moving machinery. Those limitations account for Dickinson's claim of leg numbness.

The opinion evidence from Dr. Ash and Dr. Corsolini upon which Dickinson relies does not aid his argument. The doctors were consultants who examined Dickinson once. Generally, the opinion of a consulting physician who examines a claimant only once is not treated as substantial evidence, especially if the opinion contradicts the opinion of a treating physician. *Charles v. Barnhart,* 375 F.3d 777, 783 (8th Cir. 2004). But an ALJ may consider a consulting examiner's opinion as "one factor in determining the nature and severity of a claimant's impairment," *id.*, and such opinion evidence is weighed like other medical opinion evidence, 20 C.F.R. § 404.1527.

Dr. Ash opined that Dickinson was disabled for purposes of qualifying for Medicaid. The ALJ gave the opinion little weight, because it was unsupported by Dr. Ash's own examination findings; a Medicaid determination is not binding on the SSA; and the ultimate question of whether a person is disabled for purposes of receiving disability benefits from the SSA is a question reserved for the Commissioner. These reasons support giving Dr. Ash's opinion little weight. *See Boyd v. Colvin*, No. 15-2980, 2016 WL 4150922, at *4 (8th Cir. Aug. 5, 2016) ("An absence of clinical findings supports the rejection of a physician's opinion as to physical limitations."); 20 C.F.R. § 404.1504 (Medicaid determinations are not binding on the SSA because they are governed by different law and regulations); and *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005) (doctor's opinion that claimant is disabled involves issue reserved to Commissioner and is not the type of medical opinion to which Commissioner gives controlling weight).

The ALJ gave Dr. Corsolini's opinion only some weight. The doctor's findings on exam

12

were mild. He found some limit in lumbar flexion and extension and the ability to squat without a handhold, and a positive straight-leg test on the right, but he also found Dickinson could walk normally and without an assistive device, and had normal reflexes and strength, as well as normal range of motion in both hips. The doctor opined that limits of four hours sitting and standing, among other limits, were appropriate. The ALJ concluded those limitations were not supported by the relatively mild findings on physical exam, which is an appropriate reason to give the opinion no more than some weight. *See Boyd*, 2016 WL 4150922, at \*4.

Dr. Corsolini's opinion is also inconsistent with other medical evidence, including Dr. Morgan's exam the following month. Dr. Morgan's only positive finding was that the straight leg test was tolerated to 80 degrees. Dr. Morgan did not opine that Dickinson was limited in any way, and even referred him to a physiatrist for treatment. The inconsistency of Dr. Corsolini's opinion with other evidence in the record is further reason to afford it only some weight. *See* 20 C.F.R. § 404.1527.

Dickinson also points out that Dr. Corsolini's impression was "probable right-sided lumbar pain with radicular radiation to the right leg." But an inability to work pain-free is not alone "a sufficient reason to find a claimant disabled." *Martin v. Colvin,* 2013 WL 4060002, at \*20 (W.D. Mo. Aug. 10, 2013) (quoting *Gossett v. Bowen,* 862 F.2d 802, 807 (10th Cir. 1988)). *See also McGuire v. Apfel,* 151 F.Supp.2d 1260, 1269 (D. Kan. 2001) (same).

In any event, Dr. Corsolini specifically stated Dickinson's condition had not lasted nor would last for twelve consecutive months, and that it "could improve [with] treatment." Tr. 542. To establish he has a disabling condition for purposes of entitlement to disability benefits, Dickinson was required to show he is unable to engage in any substantial gainful activity by reason of a medically determinable impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. § 1382c. Therefore, Dr. Corsolini's

13

opinion regarding the temporary nature of Dickinson's condition in fact undercuts Dickinson's claim of disability.[3]

Substantial evidence on the record as a whole, including medical evidence, supports the RFC determination.

In his reply brief, Dickinson adds that although the Commissioner relies on the ALJ's credibility determination in evaluating symptoms, credibility is a "red herring" because the Social Security Administration has issued a new ruling about evaluation of symptoms for disability claims that no longer uses the term "credibility." Doc. 14, p. 8 of 12. The new SSR does not change the analysis here.

SSR 16-3, "Evaluation of Symptoms in Disability Claims," supersedes SSR 96-7p and became effective March 16, 2016. 2016 WL 1119029. The Purpose statement of the new ruling explains that the term "credibility" was being eliminated from the policy because SSA's regulations do not use the term. *Id.* at 1. The Purpose statement further provides:

> In doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation. Consistent with our regulations, we instruct our adjudicators to consider all of the evidence in an individual's record when they evaluate the intensity and persistence of symptoms after they find that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms. ….

*Id.* at *1-2. The SSA's regulation concerning evaluation of symptoms, including pain, 20 C.F.R.

---

[3] Other evidence in the record also supports the conclusion that Dickinson's condition is temporary and could improve with treatment, including his physician's note that he was "OK" to look for work after having a back strain, another's note that he was offered exercises, and another's referral to a physiatrist for treatment. It is also consistent with Dr. Langguth's approval of a temporary, rather than permanent, disabled placard.

14

§§ 404.1529 and 416.929, remain unchanged.[4]

Dickinson's challenge here is to the medical evidence supporting the RFC. As discussed above, the RFC is supported by substantial evidence on the whole record, including medical evidence. Furthermore, the new SSR did not change the regulations concerning evaluation of symptoms and continues to rely on those existing regulations, and Dickinson has not shown, nor does he even suggest, that the *manner* in which the ALJ evaluated his symptoms somehow prejudiced him.[5] Reversal is not necessary when a claimant has not demonstrated prejudice. *Samons v. Astrue,* 497 F.3d 813, 821-22 (8th Cir. 2007). Accordingly, the new SSR does not change the analysis.

### III. Conclusion

The Commissioner's decision is affirmed.

s/ Nanette K. Laughrey  
NANETTE K. LAUGHREY  
United States District Judge

Dated: August 15, 2016  
Jefferson City, Missouri

---

[4] These two regulations use the familiar factors identified in *Polaski v. Heckler,* 739 F.2d 1320 (8th Cir. 1984).

[5] The Court does not decide whether the new SSR is retroactive.

15